**19-644**
*D.S. v. Trumbull Bd. of Ed.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

——————————

August Term 2019

(Argued: April 21, 2020 | Decided: September 17, 2020)

Docket No. 19-644

D.S., BY AND THROUGH HIS PARENTS AND NEXT FRIENDS, M.S. AND
R.S.,

*Plaintiff-Appellant,*

v.

TRUMBULL BOARD OF EDUCATION,

*Defendant-Appellee.*

——————————

Before:

WINTER, WESLEY, SULLIVAN, *Circuit Judges*.


D.S. is a child with a disability who receives special education services under the Individuals with Disabilities Education Act (the "IDEA" or the "Act"). D.S. appeals (by and through his parents) from a judgment of the District of Connecticut (Meyer, *J.*), denying his motion for summary judgment and granting the motion for summary judgment of Defendant-Appellee, Trumbull Board of Education (the "Board"). Under the IDEA and its implementing regulations, if the parent of a child with a disability disagrees with an evaluation obtained by a school, the parent is entitled to an independent educational evaluation ("IEE") at public expense, unless the school can demonstrate that the evaluation it conducted was appropriate. In May 2017, D.S.'s parents disagreed with the functional

behavioral assessment ("FBA") that D.S.'s school conducted earlier that year and sought a comprehensive IEE at public expense. In the alternative, D.S.'s parents challenged D.S.'s comprehensive reevaluation from 2014 as an independent basis for the publicly funded IEE.

Although the parties stipulated that D.S.'s FBA was an "evaluation" under the IDEA, the district court concluded that a parent's right to an independent "evaluation" was limited by the scope of the contested "evaluation." With respect to D.S.'s 2014 evaluation, the district court concluded that the parents' challenge was barred by the IDEA's two-year statute of limitations for filing due process complaints. We disagree as to both conclusions. We hold that an FBA is not an evaluation as that term is employed in the relevant IDEA provisions and that a parent's dissatisfaction with an FBA does not entitle them to a publicly funded IEE. As for his parents' disagreement with D.S.'s 2014 reevaluation, we hold that parents need not file a due process complaint under the IDEA to disagree with an evaluation and that the statute of limitations does not apply here; rather, the IDEA's cyclical evaluation process establishes the operative time frame in which a parent may disagree with an evaluation and obtain an IEE at public expense.

Accordingly, we **VACATE** the judgment and **REVERSE** the decision of the district court. We **REMAND** for proceedings consistent with this opinion.

———————————

LEONID TRAPS, Sullivan & Cromwell LLP, New York, NY (Mark Sargent, Westport, CT; Richard C. Pepperman II, James J. Browne, Sullivan & Cromwell LLP, New York, NY, *on the brief*), *for Plaintiff-Appellant*.

RYAN P. DRISCOLL, Berchem Moses PC, Milford, CT, *for Defendant-Appellee*.

Rebecca Adams Rieder, Connecticut Association of Boards of Education, Wethersfield, CT, *for Amici Curiae Connecticut Associations of Boards of Education, National School Boards Association, and New York State School Boards Association, Inc. in support of Defendant-Appellee*.

2

Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, *for Amici Curiae Advocates for Children of New York, Legal Services, New York City, Mobilization for Justice, Inc., New York Lawyers for the Public Interest, and New York Legal Assistance Group in support of Plaintiff-Appellant*.

Ellen Saideman, Law Office of Ellen Saideman, Barrington, RI (Catherine Merino Reisman, Selene Almanzan-Altobelli, Council of Parent Attorneys and Advocates, Inc., Towson, MD; Andrew Feinstein, Mystic, CT, *on the brief*), *for Amici Curiae Council of Parent Attorneys and Advocates, Inc., National Disability Rights Network, and Disability Rights Connecticut in support of Plaintiff-Appellant*.

_____

WESLEY, *Circuit Judge*:

The Individuals with Disabilities Education Act (the "IDEA" or the "Act"), 20 U.S.C. §§ 1400 *et seq.*, contains an intricate and balanced web of procedures and safeguards that ensures children with disabilities receive appropriate public education services. This case focuses on the IDEA's prescribed evaluation process, pursuant to which a school must conduct a comprehensive initial evaluation of a child with a disability and similarly comprehensive reevaluations at least once every three years, which are used to develop the individualized academic and support services that the child receives at school. Under the IDEA and its implementing regulations, the parent of a child with a disability has the right to

3

disagree with the school's evaluation and receive an independent educational evaluation ("IEE") at public expense, which the school must consider when making decisions related to the child's education.

D.S. is a child with a disability who receives special education services under the IDEA at a therapeutic day school in Trumbull, Connecticut. D.S. underwent a comprehensive reevaluation in October 2014 and was scheduled for his next comprehensive reevaluation in October 2017, as required by the Act. With D.S.'s parents' agreement, D.S.'s school also voluntarily conducted a functional behavioral assessment ("FBA") of D.S. in the spring of each year to understand how D.S.'s problematic behavior interfered with his academic performance.

After the school conducted D.S.'s annual FBA in March 2017 (the "March 2017 FBA"), D.S.'s parents expressed concern with the appropriateness of the "evaluations" of D.S. that his school had conducted to date—including the recent FBA and D.S.'s reevaluation from 2014—and requested a comprehensive IEE at public expense addressing not only D.S.'s behavior, but all other areas of his disability as well. In doing so, the parents sought to withdraw the consent they had initially provided for the October 2017 comprehensive reevaluation, and declined the school's offer to test D.S. in each of the parents' areas of concern

4

during that upcoming reevaluation. The Trumbull Board of Education (the "Board") refused D.S.'s parents' requests, and filed a due process complaint challenging the IEE request.

An administrative hearing officer denied D.S.'s parents' request for a publicly funded IEE that addressed non-behavioral concerns. The hearing officer determined (without any objection by the Board) that an FBA is the type of evaluation under the IDEA that triggers a parent's right to an IEE at public expense, but found that there must be a connection between the evaluation with which a parent disagrees and the publicly funded IEE that they seek before a parent is entitled to the latter. Thus, D.S.'s parents could not disagree with an FBA—which only examines behavior—to obtain a comprehensive set of publicly funded non-behavioral assessments.

D.S.'s parents sought relief in federal district court (Meyer, *J.*), which found that the Board waived any argument that an FBA is not the kind of evaluation with which a parent can disagree to obtain an IEE at public expense, but affirmed the denial of D.S.'s parents' request for an IEE with non-behavioral assessments based on the same evaluation scope theory employed by the hearing officer. The district court also found that any disagreement with the reevaluation of D.S. conducted in

5

October 2014 was time-barred by the IDEA's two-year statute of limitations for filing due process complaints.

D.S. timely appealed. For the reasons stated below, we reverse the district court's decision.

## BACKGROUND

### I. The IDEA And Its Evaluation Procedures

The IDEA seeks to ensure that states provide a "free appropriate public education" (a "FAPE") to all eligible children with disabilities. 20 U.S.C. § 1412(a)(1)(A). "A FAPE, as the Act defines it, includes both 'special education' and 'related services,'" which refer to the individually tailored classroom instruction and non-academic support services that the child receives at school. *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (quoting 20 U.S.C. § 1401(9)).

A child with a disability receives this tailored instruction and support through their individualized education program ("IEP"). An IEP must include a statement of the child's academic achievement and functional performance, the child's academic and functional goals, how the child's disability affects their progress towards achieving those goals, how the child's progress will be

measured, and the services that will be provided to help the child succeed at school. *See id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(III)). As such, the IEP is "the centerpiece of the [IDEA's] education delivery system for disabled children." *Id.* (citation omitted).

Each child's IEP is developed by their "IEP Team," which is comprised of teachers, school representatives, and the child's parents or guardians. *Id.* (citing 20 U.S.C. § 1414(d)(1)(B)). Indeed, "[p]arents and guardians play a significant role in the IEP process," as "[t]hey must be informed about and consent to evaluations of their child under the Act," "[t]hey have the right to examine any records relating to their child," "[t]hey must be given written prior notice of any changes in an IEP and be notified in writing of the procedural safeguards available to them under the Act," and "[i]f parents believe that an IEP is not appropriate," they may seek an administrative hearing on the matter. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (internal citation omitted).

A child's IEP is based in significant part on the results of statutorily mandated evaluations of the child. *See, e.g.*, 20 U.S.C. § 1414(b)(2)(A)(ii), (c)(1)–(2), (d)(3)(A), (d)(4)(A). Under the IDEA, a child with a suspected disability must receive a "full and individual initial evaluation" to determine the existence and

7

extent of their disability and whether they are entitled to special education and related services under the Act. *Id.* § 1414(a)(1). The child is further entitled to a "reevaluation" at least once every three years for the purpose of updating their IEP.[1] *Id.* § 1414(a)(2), (d)(4)(a). Because it occurs by default every three years, this is generally referred to as a triennial reevaluation (a term we'll employ throughout this decision).

The IDEA requires that a child's initial evaluation and triennial reevaluations be comprehensive. In conducting these evaluations, a school must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information," *id.* § 1414(b)(2)(A), and the school must assess the child in "all areas of suspected disability," *id.* § 1414(b)(3)(B). The child's IEP Team takes the results of these evaluations and regularly collaborates to develop, maintain, and update the child's IEP over the course of their education. *See id.* § 1414(d)(4)(A) (a child's IEP Team must review their IEP "periodically, but

---

[1] As the hearing officer succinctly put it: "The IDEA provides for reevaluations to be conducted not more frequently than once a year unless the parent and school district agree otherwise, but at least once every three years unless the parent and school district agree that a reevaluation is not necessary." J.A. 789 (citing 20 U.S.C. § 1414(a)(2)(B); 34 C.F.R. § 300.303(b)).

8

not less frequently than annually, to determine whether the annual goals for the child are being achieved").

As another procedural safeguard, the parent of a child with a disability has an absolute right to obtain an IEE of their child, 34 C.F.R. § 300.502(a)(1), and the school must consider that IEE "in any decision made with respect to the provision of FAPE to the child," *id.* § 300.502(c)(1). An IEE is defined in the IDEA's implementing regulations as "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question." *Id.* § 300.502(a)(3)(i).

Though this IEE right is unfettered by statute, it is practically constrained by the parent's ability or desire to pay for an IEE. Nevertheless, there is a limited circumstance in which a parent may seek an IEE at public expense.[2] A parent is entitled to a publicly funded IEE "if the parent disagrees with an evaluation obtained by the public agency." *Id.* § 300.502(b)(1). If a parent disagrees with an evaluation and requests an IEE at public expense, "the public agency must,

---

[2] "Public expense means that the public agency either pays for the full cost of the evaluation or ensures that the evaluation is otherwise provided at no cost to the parent." *Id.* § 300.502(a)(3)(ii).

without unnecessary delay, either [] [f]ile a due process complaint to request a hearing to show that its evaluation is appropriate," or "[e]nsure that an [IEE] is provided at public expense." *Id.* § 300.502(b)(2).[3]

The IEE process attempts to level the playing field between parent and government by securing a parent's ability to obtain an independent assessment of their child's disability if the school's falls short. It provides "parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion," and it ensures that parents "are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition." *Schaffer*, 546 U.S. at 60–61. That said, other than defining an IEE as an "evaluation" conducted by someone independent from the school and explaining that an IEE at public expense is available when a parent disagrees with an "evaluation" obtained by the school, neither the IDEA nor its implementing regulations articulates with

---

[3] The IDEA and its implementing regulations govern state and local public educational agencies that receive federal assistance for the education of children with disabilities, which is why the Board is the defendant in this case as opposed to D.S.'s school itself. For ease of reference, however, we will refer to the "public agency" responsible for a child's education as their school.

specificity what constitutes an "evaluation."  D.S.'s case requires us to answer that question.

## II.    D.S.'s Evaluation History

D.S. was diagnosed with attention deficit hyperactivity disorder at age four, at which time he also exhibited signs of other developmental and behavioral disorders, such as autism.  D.S.'s "overall intelligence was in the low average range," J.A. 417, and he showed "documented delays" in his cognitive, communicative, and physical abilities, J.A. 52.

D.S. has received special education services since preschool.  He repeated kindergarten because of "delays in readiness and social skills," J.A. 52, and he has experienced a decline in intellectual functioning since the first grade.  When D.S. was in third grade, he moved with his family to Trumbull, Connecticut, where he was enrolled in the public school system.  Reports from the Trumbull Public Schools indicate that D.S. "had very little availability for learning" and exhibited significant behavioral issues, including "a high frequency of physical aggression" and "a very low frustration tolerance."  J.A. 418.

D.S. entered fifth grade in 2013.  At the beginning of the school year, D.S. transferred to Cooperative Educational Services—a therapeutic day school in

11

Trumbull that specializes in educating students who have significant behavioral issues. D.S.'s school conducted a triennial reevaluation of D.S. in October 2014 (the "October 2014 Triennial Reevaluation"), which assessed his academic, psychological, behavioral, and language abilities. These assessments revealed an overall decline in D.S.'s abilities and performance since his last triennial reevaluation, including a decline in his intelligence to the "extremely low" range. J.A. 180, 206.

D.S.'s IEP Team, to which the parties refer as his Planning and Placement Team ("PPT"), met in October 2014 to review the October 2014 Triennial Reevaluation. The PPT determined that D.S.'s behavior was significantly interfering with his progress toward achieving his academic goals. Instead of verbalizing when he was upset or frustrated, D.S. would engage in self-injurious violent behaviors, like banging his head against the wall and punching himself, or D.S. would become destructive to inanimate objects, like kicking or throwing classroom items. This dysregulation happened frequently, and often D.S. would be relocated from his classroom to a different room for space. D.S. spent a significant amount of time outside of the classroom as a result of his behavior, interrupting his academic experience and interfering with his academic progress.

12

With D.S.'s parents' consent, D.S.'s school began conducting FBAs of D.S. each year to obtain more information about his problematic behavior and to update the PPT at their annual review of D.S.'s IEP. Generally, an FBA is a means of assessing a child's problematic behavior in order to understand the cause of that behavior and establish a successful way of intervening and resolving the behavior. D.S. underwent FBAs in April 2015, March 2016, and March 2017.

D.S. was in eighth grade when his school conducted the March 2017 FBA. The March 2017 FBA reported that "[w]hen [D.S.] is emotionally regulated, he is able to complete his assignments either with the group, or in an alternative location in the classroom," but that "[w]hen he is having a particularly difficult day, he is encouraged to take as many strategies as he needs in order to stay safe and his work demands are decreased significantly." J.A. 341.

D.S.'s PPT met for D.S.'s annual IEP review in March, just after the March 2017 FBA was conducted. The PPT recommended that D.S.'s triennial reevaluation be conducted by October 2017, consistent with the IDEA, and that the reevaluation should include assessments of D.S.'s cognitive, behavioral, language, and physical abilities, including assessments targeted at diagnosing autism. The

13

PPT also discussed a plan for D.S.'s high school placement. D.S.'s mother gave her consent for the school to conduct the planned reevaluation in October 2017.

D.S.'s PPT met again in May at D.S.'s parents' request. D.S.'s parents brought a draft complaint to the meeting,[4] in which they expressed concern with the "evaluations" of D.S. that had been completed to date; indeed, the draft complaint listed every analysis, test, assessment, and evaluation that D.S. had ever received. Based on their "[c]oncerns" with the inadequacy of this "evaluation" history, D.S.'s parents requested an IEE at public expense with the following: (1) a speech and language assessment, (2) an occupational therapy assessment, (3) a home and school FBA, (4) a physical therapy assessment, (5) an assistive technology assessment, (6) a psychoeducational assessment, and (7) a central auditory processing disorder assessment. J.A. 377–78.

In response to this request, the school reminded D.S.'s parents "that comprehensive assessments for the upcoming October triennial re-evaluation had

---

[4] D.S.'s parents' complaint was drafted by their "parent advocate." Historically, just D.S.'s parents attended his PPT meetings. D.S.'s grandmother also attended the March and May 2017 PPT meetings, and the parent advocate attended for the first time at the May 2017 PPT meeting. Because it does not matter for the purpose of this opinion who attended the PPT meetings or spoke on behalf of the parents, we refer only to D.S.'s parents as the operative party.

been planned and consented to at the March 2017 PPT." J.A. 384–85. When asked with which "evaluation" they disagreed among the extensive list of D.S.'s history of assessments, testing, and evaluations, D.S.'s parents did not identify any specific one; instead, they explained that they "believed that further evaluations should have been conducted since the last triennial re-evaluation." J.A. 385.

The Board refused D.S.'s parents' request for the comprehensive IEE. The Board offered to add additional assessments to D.S.'s planned triennial reevaluation in October 2017, to cover some of the areas of concern identified in the parent's IEE request, but D.S.'s parents did not give their consent for those assessments in the upcoming reevaluation.

## III.    Procedural History

D.S.'s parents filed a formal due process complaint with the Connecticut Department of Education in May 2017. It alleged that the Board failed to provide D.S. with a FAPE as guaranteed by the IDEA, primarily due to a lack of appropriate testing and "evaluations" conducted at D.S.'s school to date. D.S.'s parents requested the same comprehensive IEE at public expense as relief for the alleged deprivation of a FAPE. The Board formally rejected D.S.'s parents' IEE request in a June 1, 2017 letter. The Board filed its own due process complaint on

15

June 30, 2017, seeking an administrative hearing to determine whether D.S.'s parents were entitled to the IEE they sought.[5]

Prior to the hearing, the Board raised the issue that, to be eligible for the ultimate relief they sought—an IEE at public expense—D.S.'s parents must disagree with an evaluation already obtained by the school. Instead of disagreeing with a specific evaluation, however, D.S.'s parents challenged the Board's alleged global failure to conduct any effective evaluations at all. The Board repeated this argument at the hearing; because D.S.'s parents had not specified any one evaluation from the many allegedly inadequate assessments in D.S.'s history, the Board identified the most recent of them (the March 2017 FBA) and explained why their disagreement with that "evaluation" did not entitle the parents to an IEE at public expense.

Specifically, the Board argued that the March 2017 FBA did not entitle the parents to a comprehensive IEE unrelated to D.S.'s behavior, because that request

---

[5] Although not directly relevant to the bulk of this appeal, it should be noted that the prehearing procedures in this case diverged from the typical administrative process. Specifically, the Board sought to withdraw its petition for a due process hearing after it offered an independent FBA at public expense in August 2017—in its view, mooting the parents' request. After the offer, the Board's case was consolidated with the parents' case, which proceeded to a hearing on whether D.S.'s parents were entitled to the comprehensive IEE.

was outside the scope of what is measured by an FBA. The Board also acknowledged D.S.'s last comprehensive reevaluation—the October 2014 Triennial Reevaluation—but argued that any challenge to that evaluation would be untimely. In response, D.S.'s parents argued that they were objecting to the March 2017 FBA, which was "part of" an evaluation, and which entitled them to a comprehensive IEE at public expense. J.A. 530–31, 535. They also argued that the two-year statute of limitations for filing due process complaints under the IDEA did not apply to IEE requests.

The hearing officer concluded that "[t]he parties do not dispute that [the March 2017 FBA] was an evaluation which triggered a Parental right to an IEE," J.A. 785, and found that an FBA is an evaluation for these purposes. But the hearing officer denied D.S.'s parents' request for an IEE covering the additional non-behavioral assessments they requested, because those assessments were outside the scope of what is measured by an FBA.[6]

---

[6] The hearing officer also found that D.S.'s parents' request for an independent FBA was mooted by the Board's later agreement to pay for that assessment and that the March 2017 FBA was not fully appropriate because it did not allow the school or the parents to understand the root causes of D.S.'s behavioral problems. The hearing officer therefore granted D.S.'s parents' IEE request for an independent Behavior Assessment for Children test at public expense. Those decisions are not before us for review.

17

D.S.'s parents appealed to federal district court. In ruling on the parties' cross-motions for summary judgment, the district court found that the Board waived any argument that the March 2017 FBA is not an evaluation under the IDEA because the Board did not object to the hearing officer's contrary conclusion. The district court affirmed the hearing officer's decision based on the same theory that there must be a connection between the contested evaluation and the type of IEE that the parent requests as a result of that disagreement. Under the district court's decision, a parent cannot obtain a comprehensive IEE at public expense when they disagree with a limited assessment such as an FBA; their right to a publicly funded assessment in that instance is constrained by the scope of the contested FBA. The district court also found that, to the extent D.S.'s parents disagreed with the October 2014 Triennial Reevaluation, that challenge was untimely, because the IDEA's two-year statute of limitations for filing due process complaints also applies to IEE requests.

The district court entered judgment in favor of the Board, and D.S.'s parents timely appealed.

**DISCUSSION**

This case presents two issues of first impression. As to the parents' disagreement with the March 2017 FBA, we consider whether an FBA is an "evaluation" that triggers a parent's right to an IEE at public expense. As to their disagreement with the October 2014 Triennial Reevaluation, we consider whether the IDEA's two-year statute of limitations for filing due process complaints applies to a parent's IEE request.[7] The answer to each question is no.

## I. An FBA Is Not An Evaluation That Triggers A Parent's Right To An IEE At Public Expense.

D.S.'s parents argue, the hearing officer found without objection, the district court assumed, and the Board concedes that an FBA constitutes an "evaluation" with which a parent may disagree to obtain an IEE at public expense. As a result, the hearing officer and district court both concluded that, with respect to a limited assessment like an FBA, a parent's right to disagree may not exceed the scope of

---

[7] "We review *de novo* the district court's grant of summary judgment in an IDEA case." *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). Though we must give "due weight" to the administrative record, *id.* (citation omitted), "[w]hether the district court correctly applied the IDEA's statutory and regulatory provisions to the facts of a particular case is a mixed question of law and fact, which we also review *de novo*," *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005).

the contested evaluation.  This contention/finding/assumption/concession accepts a false equivalency that if not righted produces a remedy at odds with the purpose and intent of the Act.

### A.    The Board's Concession

When a party makes a concession on appeal as to an issue of law or fact, we typically accept or assume the accuracy of the concession without question.  This practice permits the parties to frame the litigation.  It also gives us flexibility in our decision-making process.

But "the concession of a point on appeal by [a party] is by no means dispositive of a legal issue."  *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 (1999).  A court is "not required to accept such a concession when the law and record do not justify it."  *United States v. Linville*, 228 F.3d 1330, 1331 n.2 (11th Cir. 2000).  That is the case here.  As we explain below, the Board's concession that an FBA is an evaluation for the purpose of triggering a parent's right to an IEE at public expense is contrary to the plain language of the IDEA and its implementing regulations.  If we were to blindly accept the Board's concession, our decision might mislead similarly situated parents and schools into misunderstanding and misapplying the IDEA's evaluation procedures.  That risk is too great.

20

Accordingly, we reject the Board's concession and conduct *nostra sponte* a review of the issue on the merits.

## B.     Evaluations Versus FBAs

What then is an "evaluation" as that term is employed in the IDEA and its implementing regulations?  "As with any question of statutory interpretation, we begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012).  To determine a statute's plain meaning, we "look[] to the statutory scheme as a whole and plac[e] the particular provision within the context of that statute." *Id.* (citation omitted).

The IDEA's mandatory evaluation process is set forth in Section 1414 of the Act.  As explained above, it discusses two types of evaluations: initial evaluations and reevaluations.  *See* 20 U.S.C. § 1414(a)(1)–(2).  That the statute does not expressly or impliedly mention a third category of evaluations comprised of limited or targeted assessments suggests that there is none.

In fact, the Act's mandatory initial evaluations and reevaluations are purposefully comprehensive.  Each must be "conducted in accordance with" certain procedures outlined in the statute.  *See id.* § 1414(a)(2)(A), (b)–(c).  Those

21

procedures prescribe mandatory evaluation conduct, including that the school (1) use "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information," *id.* § 1414(b)(2)(A); (2) "not use any single measure or assessment as the sole criterion for . . . determining an appropriate educational program for the child," *id.* § 1414(b)(2)(B); (3) "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors," *id.* § 1414(b)(2)(C); and (4) "assess[] [the child] in all areas of suspected disability," *id.* § 1414(b)(3)(B). The statutory language is clear; an evaluation means a comprehensive assessment of the child that follows the mandatory procedures outlined in Section 1414 of the IDEA, including assessing the child in <u>**all**</u> areas of their disability.

This conclusion is supported by the IDEA's implementing regulations, which, for these purposes, depend entirely on the meaning of the term "evaluation." The regulations define an IEE as "an *evaluation* conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question." 34 C.F.R. § 300.502(a)(3)(i) (emphasis added). The regulations establish that a parent's right to an IEE at public expense is

triggered when the parent "disagrees with an *evaluation* obtained by the public agency." *Id.* § 300.502(b)(1) (emphasis added). And the regulations provide that "*[e]valuation* means procedures used in accordance with §§ 300.304 through 300.311 to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs." *Id.* § 300.15. Sections 300.304 through 300.11 of the regulations, in turn, parrot and expand upon the mandatory evaluation conduct and procedures outlined in Section 1414 of the IDEA. *See, e.g., id.* § 300.304; *see also* J.A. 789 (hearing officer's conclusion of law that "[a]n evaluation under 34 C.F.R. § 300.304 refers to the processes and procedures used to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining . . . [t]he content of the child's IEP, which includes the use of technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors" (internal quotation marks omitted)). Thus, both the statutory and regulatory language confirms that an "evaluation" means an "initial evaluation" or a "reevaluation."

An FBA, standing alone, is neither.  By title and definition, an FBA is not a comprehensive assessment of a child's disability.  It is a purposefully targeted examination of the child's behavior.  Unlike an initial evaluation or reevaluation, which must "assess[] [the child] in all areas of suspected disability," 20 U.S.C. § 1414(b)(3)(B), an FBA looks at just one part: the child's behavior. [8]

The parties agree that an FBA is a means of assessing and understanding the root causes and functions of a child's behavior.  *See* Appellant Br. 37 ("A functional

---

[8] Even assuming that the IDEA's language is ambiguous, the historical development of the statutory language and the statutory scheme more broadly confirm that an FBA is different from an evaluation. *See Louis Vuitton Malletier S.A.*, 676 F.3d at 108 ("A particular statute's 'plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'" (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003)).  Public schools have utilized FBAs since at least the 1997 amendments to the IDEA, which included provisions (1) requiring a child's IEP Team to consider and implement behavioral intervention strategies if the child's behavior interfered with the child's learning or that of other children, and (2) requiring schools to conduct FBAs and implement appropriate behavioral intervention plans if a school removed the child from their educational placement for disciplinary reasons.  *See* Individuals with Disabilities Education Act Amendments of 1997, Pub. L. 105-17 § 101, 111 Stat. 37 (1997).  Those provisions, though further amended, remain in effect today and confirm that FBAs are not "evaluations" or "reevaluations" as those terms are defined by the statute and implementing regulations. *See* 20 U.S.C. § 1414(d)(3)(B)(i); *id.* § 1415(k)(1)(D)(ii), (k)(1)(F)(i).  That the IDEA elsewhere includes the term "functional behavioral assessment" but does not incorporate it as a type of evaluation in Section 1414 further suggests that an FBA is not, standing alone, an evaluation under the Act.  So too does the fact that FBAs are specifically guaranteed in the IDEA as a procedural safeguard only where a child's behavior warrants serious disciplinary measures; the IDEA does not specifically require an IEP Team to conduct an FBA if a child's classroom behavior generally interferes with learning.

24

behavioral assessment measures target behaviors or areas of concern to understand the function of those behaviors." (internal quotation marks, alteration, and citation omitted)); Appellee Br. 12 n.7 ("An FBA is a process of gathering and analyzing data in an effort to determine what function an exhibited behavior may be serving for a child."). The Connecticut Department of Education similarly defines an FBA as "an assessment that looks at why a child behaves the way he or she does, given the nature of the child and what is happening in the environment. It is a process for collecting data to determine the possible causes of problem behaviors and to identify strategies to address the behaviors." Connecticut State Department of Education, *A Parent's Guide to Special Education in Connecticut*, Commonly Used Terms, vi (2007), https://portal.ct.gov/-/media/SDE/Special-Education/Parents_Guide_SE.pdf.

An FBA seeks to understand to what extent the child's behavior is a manifestation of their disability and how the child's behavior impacts their ability to learn. By its nature, it is limited to understanding and improving one aspect of the child's overall learning experience. Any given FBA might employ different techniques, but those techniques are uniformly aimed at understanding only the child's behavior. Thus, in stark comparison to the plain text of the IDEA, an FBA

is not an "evaluation," because it is not a comprehensive, multi-focused assessment of all areas of the child's disability.

FBAs often contribute to a child's initial evaluation or triennial reevaluation; but they are not one and the same. FBAs are generally conducted to inform a child's behavioral intervention plan ("BIP"), which the Connecticut Department of Education defines as "[a] plan and/or strategies, program or curricular modifications, and supplementary aids and supports developed by a [PPT] to teach a child appropriate behaviors and eliminate behaviors that impede his/her learning or that of others," which is "positive in nature, not punitive." Connecticut State Department of Education, *A Parent's Guide to Special Education in Connecticut*, Commonly Used Terms, vi (2007), https://portal.ct.gov/-/media/SDE/Special-Education/Parents_Guide_SE.pdf. IEP Teams often employ FBAs and BIPs as "positive behavioral interventions and supports" where, as here, the child's "behavior impedes the child's learning or that of others." 20 U.S.C. § 1414(d)(3)(B)(i).

But FBAs and BIPs are just examples of the types of tools and strategies that an IEP Team might recommend in a situation where a child's behavior interferes with classroom learning. Only where a child is seriously disciplined for behavior

26

that is a manifestation of their disability is a school required to conduct an FBA and implement or review the child's BIP. *See id.* § 1415(k)(1)(E)–(F). For example, before the hearing officer in this case, D.S.'s parents argued that the March 2017 FBA was not appropriate, in part because the scales that the FBA employed did not fully examine the nature or causes of D.S.'s behavior. The hearing officer agreed and granted D.S.'s parents an independent assessment at public expense called a "Behavior Assessment for Children," which uses a different rating scale than the March 2017 FBA. The hearing officer felt that this assessment would better account for D.S.'s "undisputed complex profile," because it would explore whether the cause of D.S.'s dysregulation was antecedent to or temporally related to the problematic behaviors themselves. J.A. 786, 790.

Accordingly, an FBA is best considered as an "assessment tool" or "evaluation material" that a school can use in conducting an evaluation. *See* 20 U.S.C. § 1414(b)(2)(A), (b)(3)(A). Assessment tools are employed in the evaluation process to "yield accurate information on what the child knows and can do academically, developmentally, and functionally." *Id.* § 1414(b)(3)(A)(ii). But an assessment tool is not an "evaluation" in its own right —at least not with respect to a parent's entitlement to an IEE at public expense.

27

We note that the district court did not reach a different legal conclusion; instead, the district court assumed that the March 2017 FBA constituted an evaluation that would trigger D.S.'s parents' right to an IEE at public expense, because it found that the Board waived any argument to the contrary. *See* S.A. 10 n.1. Indeed, the district court suggested that it did not think an FBA is an evaluation for these purposes. *See id.* (citing *In re Butte Sch. Dist. No. 1*, No. CV 14-60, 2019 WL 343149, at *8–9 (D. Mont. Jan. 28, 2019) in support). Following its assumption, the district court reasoned that if a parent disagrees with a limited assessment like an FBA, there must be a connection between the assessment with which a parent disagrees and the IEE that they seek. *See id.* at 13.

Although we need not address this subsequent finding for the purpose of our decision, we nevertheless discuss it briefly, because this scope finding was the focus of the district court's opinion and the parties' appellate briefs, and the flaw in the district court's reasoning on this point also supports our holding that an FBA is not an evaluation for the purpose of triggering a parent's IEE right.

If a parent disagrees with an evaluation and requests an IEE at public expense, the regulations do not circumscribe the scope of that IEE. *See* 34 C.F.R. § 300.502(b)(1). Nothing in the statute or regulations suggests that a parent cannot

28

challenge an evaluation on the ground that it was too limited.  To the contrary, because the IDEA requires an evaluation to be comprehensive, one would expect that a parent is free to disagree with an evaluation based on its deficient scope. There is no basis for the district court's bifurcation of how a parent may disagree.

Rather, this scope-of-disagreement restriction that the hearing officer and district court created seems to be a workaround for the unintended effect of their conclusion that limited assessments like FBAs are evaluations.  By mischaracterizing FBAs as evaluations, the Board unwittingly opened the door for parents who disagreed with a limited assessment to demand a comprehensive IEE at public expense before the school had the chance to conduct its own comprehensive evaluation—precisely what D.S.'s parents tried to do in this case.

As the district court recognized, that would be contrary to the overall evaluation process established in the IDEA, as well as the purpose of the IEE right itself.  A school has the right in the first instance to obtain a comprehensive evaluation upon which to structure a student's IEP, and only if the child's parents believe that the evaluation is insufficient can they seek an IEE at public expense for the school's additional consideration.  The publicly funded IEE protects parents' ability to contribute and have their voices heard; but this right arises in

29

response to school action, it does not preempt it. Nor does it give parents the first and final word. The school, as a beneficiary of federal funds, has the right and obligation to conduct an evaluation in the first instance and to prove that its evaluation was appropriate. Only when those established procedures fall short does a parent get an IEE at public expense. *See Schaffer*, 546 U.S. at 60–61.

We agree with the district court that parents should not be able to use limited assessments as a hook to obtain publicly funded comprehensive independent evaluations before the school can conduct its own. But we cannot write into the IDEA or its implementing regulations a restriction on a parent's right to disagree with an evaluation, just to avoid the absurd results that flow from the decision to treat FBAs as evaluations in the first place. *See Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 106 n.9 (2d Cir. 2019) ("[T]he statute does not include this language, and we may not 'add words to the law to produce what is thought to be a desirable result.'" (quoting *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015))). Thus, our conclusion that limited assessments like FBAs are not evaluations aligns with both the statutory language and the purpose of the publicly funded IEE right.

The Board explained that it conceded otherwise because, in its opinion, enough cases have concluded that an FBA is an evaluation giving rise to a parent's publicly funded IEE right under the IDEA. But the Board only relies on two out-of-circuit district court cases, neither of which persuades us to reach a different conclusion. In the first, *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 68 (D.D.C. 2008), the district court concluded that an FBA is an evaluation because of "[t]he FBA's fundamental connection to the quality of a disabled child's education." We agree that an FBA has a fundamental connection to a child's IEP; for many students it is a critical assessment tool in their evaluation process. But for the reasons just discussed, that the FBA is a fundamental part of an evaluation does not transform it into an "evaluation" itself. We therefore decline to adopt the reasoning in *Harris*.

As for the second case relied on by the Board—*H.D. ex rel. A.S. v. Central Bucks School District*, 902 F. Supp. 2d 614, 627 (E.D. Pa. 2012), in which the district court rejected the parents' IEE request for an independent FBA, because nothing in the record suggested that the contested FBA was flawed—the court in that case

31

never addressed the question of whether the FBA was a "evaluation" for such purposes. Consequently, we do not find this case persuasive either.[9]

Although not relied upon by the Board, the U.S. Department of Education has issued two policy letters in which it too endorses the conclusion that FBAs are the equivalent of evaluations for purposes of triggering the right to an IEE. For example, in its February 9, 2007 "Letter to Christiansen," the Department of Education opined that "[i]f [an] FBA is conducted for individual evaluative purposes to develop or modify a behavioral intervention plan for a particular child, under 34 CFR § 300.502, a parent who disagrees with the child's FBA would have the right to request an IEE at public expense." Letter to Christiansen, U.S. Dep't of Educ. Office of Spec. Ed. and Rehab. Servs., 2 (Feb. 9, 2007), https://www2.ed.gov/policy/speced/guid/idea/letters/2007-1/christiansen020907discipline1q2007.pdf. This reiterated the Department of Education's opinion from its June 7, 2000 "Letter to Scheinz," in which it opined that a parent would be entitled to an IEE at public expense where, as here, they disagreed with an FBA

---

[9] In his post-argument letter of May 4, 2020, D.S. cites to three additional out-of-circuit district court cases concluding that an FBA is an evaluation under the IDEA. But those cases—each of which relies on *Harris*—fail to convince us otherwise for the same reason that *Harris* comes up short.

that was conducted at the direction of an IEP Team but not as a part of a child's initial evaluation or triennial reevaluation. *See* Letter to Scheinz, U.S. Dep't of Educ. Office of Spec. Ed. and Rehab. Servs., 1–2 (June 7, 2000), https://www2.ed.gov/policy/speced/guid/idea/letters/2000-2/scheinz060700evals2q2000.pdf. Letter to Scheinz explained that an FBA constitutes a reevaluation under the IDEA because "the assessment . . . was conducted for the purpose of developing an appropriate IEP for the child," and as a result, the regulatory provisions applied. *Id.*; *see also* U.S. Dep't of Educ. Office of Spec. Ed. and Rehab. Servs., *Questions and Answers on Discipline Procedures* 15–16 (2009), https://www2.ed.gov/policy/speced/guid/idea/discipline-q-a.pdf.

For the reasons stated above, we disagree. The Department of Education's interpretation ignores the plain text of the statute and regulations, and therefore we owe it no deference. *See Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 779–80 & n.7 (2d Cir. 2002) ("To the extent that there is ambiguity [in a federal regulation], we may look to how the federal Department of Education has construed its own regulation. An agency's consistent interpretation of its regulations is to be given controlling weight unless plainly erroneous or inconsistent with the regulation."); *see also Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("[A]n agency's

33

interpretation of its own regulation is entitled to deference . . . when the language of the regulation is ambiguous. The regulation in this case, however, is not ambiguous . . . . To defer to the agency's position [articulated in an opinion letter] would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").

Because the March 2017 FBA was not an evaluation as that term is employed in the IDEA, D.S.'s parents did not have a right to an IEE at public expense based on their disagreement with that assessment. Rather than demand a comprehensive IEE at public expense in response to this targeted assessment of D.S.'s behavior, the parents could have requested that the school conduct another reevaluation of D.S.—as is their right, and as the school had already scheduled to take place in a few months. *See* 20 U.S.C. § 1414(a)(2)(A) ("A local educational agency shall ensure that a reevaluation of each child with a disability is conducted . . . if the child's parents . . . request[] a reevaluation.").

Had the parents sought such relief, the alleged harm could have been promptly redressed. And if the new evaluation and its suggestions came up short, then D.S.'s parents could have voiced their disagreement and obtained the publicly funded comprehensive evaluation they seek in this case.

They did not. Instead, D.S.'s parents attempted to use a challenge to a single assessment tool as a means to bypass the entire evaluation process prescribed by the IDEA. That maneuver would effectively put the cart before the horse, upending carefully considered procedures for how evaluations are obtained, conducted, and reviewed. *See T.P. ex rel. T.P. v. Bryan Cnty. Sch. Dist.*, 792 F.3d 1284, 1293 (11th Cir. 2015) ("The parental right to an IEE is not an end in itself; rather, it serves the purpose of furnishing parents with the independent expertise and information they need to confirm or disagree with an extant, school-district-conducted evaluation.").

**II.     The IDEA's Two-Year Statute Of Limitations For Filing Due Process Complaints Does Not Apply To IEE Requests.**

As an alternative basis for asserting their right to a comprehensive IEE at public expense, D.S.'s parents also claim to disagree with the October 2014 Triennial Reevaluation. In rejecting this claim, the district court found that, though "[t]here is little doubt that a triennial evaluation of the type that was conducted for D.S. in October 2014 would qualify as an 'evaluation' under the IDEA," this challenge was untimely under the IDEA's established dispute resolution procedures. S.A. 16–18. We agree with the district court's conclusion that the October 2014 Triennial Reevaluation is an evaluation that triggers a

parent's right to an IEE at public expense, but disagree with the district court's subsequent conclusion that the IDEA's two-year statute of limitations for formal dispute resolution applies to that right.

Generally, "[w]hen disagreement arises [with respect to a child's FAPE], parents may turn to dispute resolution procedures established by the IDEA." *Endrew F.*, 137 S. Ct. at 994. "The parties may resolve their differences informally," or if informal measures fail, the parties may proceed to a formal due process hearing. *Id.* The IDEA contains a two-year statute of limitations for "any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," which runs from the date on which the party knew or should have known of the alleged violation. 20 U.S.C. § 1415(b)(6)(A)–(B).

The district court determined that, if D.S.'s parents "disagreed with the [October 2014 Triennial Reevaluation], they should have timely stated any such disagreement and pursued any due process hearing for any denial of an IEE at public expense within two years of the triennial evaluation." S.A. 18. Thus, according to the district court, D.S.'s parents needed to express their disagreement

with the October 2014 Triennial Reevaluation by October 2016, but because they waited until May 2017 to present their draft complaint to the Board, any disagreement with evaluations of D.S. that were conducted before May 2015 was untimely.

This misconstrues the process by which a parent receives an IEE at public expense. All a parent must do is "disagree[] with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b)(1). Once the parent has disagreed, the burden automatically shifts to the school either to "[f]ile a due process complaint to request a hearing to show that its evaluation is appropriate," or "[e]nsure that an [IEE] is provided at public expense." *Id.* § 300.502(b)(2)(i)–(ii). "If a parent requests an [IEE at public expense], the public agency may ask for the parent's reason why he or she objects to the public evaluation," but "the public agency may not require the parent to provide an explanation and may not unreasonably delay either providing the [IEE] at public expense or filing a due process complaint to request a due process hearing to defend the public evaluation." *Id.* § 300.502(b)(4).

37

At no point does a parent need to file a due process complaint to obtain an IEE at public expense.[10]

The only hypothetical scenario in which a parent might need to file a due process complaint for a hearing to seek an IEE at public expense is if the school unnecessarily withheld a requested IEE or failed to file its own due process complaint to defend its challenged evaluation as appropriate. In other words, a parent would only need to seek formal redress if the school ignored its express obligations under the IDEA. But the two-year statute of limitations for filing that due process complaint would run from the date of the statutory violation, not the date on which the contested evaluation was conducted. *See* 20 U.S.C. § 1415(b)(6) (a due process complaint should "set[] forth an alleged violation that occurred not

---

[10] Although a parent's disagreement with an evaluation could be construed as a "complaint" about an evaluation, *see* 20 U.S.C. § 1415(b)(6), the word "complaint" in the statute refers to a formal due process complaint, not any freestanding objection as that word is generally employed in common parlance. Thus, although Section 1415(b)(6)—which sets forth the general two-year statute of limitations at issue here—uses the word "complaint," Section 1415(b)(7)—which discusses the requisite notice for a complaint as a procedural safeguard under the Act—uses the more precise phrase "due process complaint." Section 1415(b)(7)(A)(i) makes clear that the "due process complaint notice" for which it provides must be included "in the complaint filed under [Section 1415(b)(6)]." This confirms that the "complaint" referenced in Section 1415(b)(6) means a formal due process complaint.

more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint").[11]

The IDEA does not provide a statute of limitations for a parent's right to disagree with an evaluation for the purpose of obtaining an IEE at public expense. But that does not mean that a parent will be able to abuse the process to obtain a publicly funded IEE based on their disagreement with an old evaluation. *See* Appellee Br. 7 (highlighting the Board's fears that a parent might request an IEE "even 100 years after the underlying evaluation" is conducted). As a practical matter, a parent's right to disagree with an evaluation and obtain an IEE at public expense is tethered to the frequency with which the child is evaluated. And the

---

[11] In this case D.S.'s parents first expressed their disagreement with the "evaluations" of D.S. by presenting the Board with a draft due process complaint and then by filing a formal due process complaint shortly thereafter. That D.S.'s parents chose a more formal route to disagree, however, does not mean they had to employ such means. Indeed, as at least one district court has noted, the IDEA does not prescribe any formal way in which a parent must disagree with an evaluation, which suggests that there is none. *See Genn v. New Haven Bd. of Educ.*, 219 F. Supp. 3d 296, 317 (D. Conn. 2016). We doubt that the IDEA would promote form over substance in this regard, but we need not resolve that issue here. What's operative for our purposes is that once a parent disagrees with an evaluation—however that disagreement is expressed—the school bears the immediate and automatic burden to respond accordingly. Here, the Board filed its own due process complaint, and the two complaints—raising identical issues—were ultimately consolidated and resolved together, rendering harmless any departure from the standard administrative procedures required by the IDEA.

39

IDEA establishes a logical timeframe in which a parent's right to request an IEE is actionable.

"A parent is entitled to only one [IEE] at public expense each time the public agency conducts an evaluation with which the parent disagrees." 34 C.F.R. § 300.502(b)(5). Because the only evaluations that trigger a parent's right to an IEE at public expense are the initial evaluation and triennial reevaluations discussed in Section 1414 of the Act, a parent's right to an IEE at public expense ripens each time a new evaluation is conducted. The time within which a parent must express their disagreement with an evaluation and request an IEE depends on how frequently the child is evaluated.

By default, triennial reevaluations must occur at least once every three years. 20 U.S.C. § 1414(a)(2)(B)(ii). Where, as here, a child is evaluated according to the default evaluation timeline, the parent must disagree with an evaluation within that three-year timeframe. By contrast, should a parent and school agree that the child be evaluated on a more frequent basis, *see id.* § 1414(a)(2)(A), (a)(2)(B)(i), the parent must disagree with any given evaluation before the child's next regularly scheduled evaluation occurs. For example, if a child is reevaluated each year, the logical time frame within which to contest the evaluation is one year.

40

Otherwise, the parent's disagreement will be rendered irrelevant by the subsequent evaluation.

The timeframe within which a parent can disagree must be adjustable because the evaluation that a parent may contest is a moving target. The IDEA fosters collaboration, discussion, and flexibility among a child's IEP Team, which ensures that a child's educational experience is unique and tailored to their individual needs. *See Endrew F.*, 137 S. Ct. at 994. Separating the IEE process from the formal dispute resolution process serves to reinforce the focus on collaboration and communication among an IEP Team. It provides an additional opportunity for discussion and cooperation between parent and school before the parties feel that they need to resort to formal procedures. As explained above, the IEE process secures a parent's right to be heard in response to the school's position: it allows a dialogue. How that coordination is accomplished will be unique to each child.

Accordingly, as applied to this case, D.S.'s parents' disagreement with the October 2014 Triennial Reevaluation was not untimely, as they asserted their general disagreement with all evaluations of D.S. conducted to date before his next

reevaluation occurred in October 2017.[12]  That does not imply that D.S.'s parents were entitled to a comprehensive IEE at public expense, however.  The Board still has the right to demonstrate that the evaluation it obtained was appropriate.  34 C.F.R. § 300.502(b)(2)(i).

Though we decline D.S.'s parents' invitation to review the administrative record and decide whether the October 2014 Triennial Reevaluation was appropriate, we note that this question should not be answered in a vacuum.  An evaluation is an assessment of the child's abilities and functionalities at a certain point in time.  The October 2014 Triennial Reevaluation might not have been appropriate, or it might have become outdated by the end of the three years in which it was operative.  The latter does not necessarily imply the evaluation was not appropriate at the time it was conducted; it could also suggest that, in order for his school to provide D.S. with a FAPE, D.S. should undergo comprehensive reevaluations more frequently than once every three years, to match the rate at which his disability develops and changes.  *See Endrew F.*, 137 S. Ct. at 999 ("To

---

[12] Because we find that the statute of limitations upon which the Board relies does not apply to D.S.'s parents' IEE request, we need not address D.S.'s related argument that the Board waived any statute of limitations defense.

meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.").

That is a separate issue from whether D.S.'s parents are entitled to an IEE at public expense nearly three years after the reevaluation was conducted. *See, e.g., N.D.S. ex rel. de Campos Salles v. Acad. for Sci. & Agric. Charter Sch.*, No. 18-CV-0711, 2018 WL 6201725, at *2 (D. Minn. Nov. 28, 2018) ("Informing a school that, subsequent to an evaluation, a child's condition has changed is not the same thing as disagreeing with the evaluation."). If a parent disagrees with a school's intermediary limited assessment because they believe that a more comprehensive evaluation was appropriate at that time, the logical remedy would be more frequent evaluations—and the parents are entitled to request one per year—not an IEE at public expense. If the parent disagrees with those evaluations, then they would be free to request an IEE at public expense with which to counter.

We leave those issues for the district court to resolve on remand—either by sending this case back to the hearing officer for their consideration in the first instance in administrative proceedings, or by reviewing the administrative record itself and reaching a decision thereon. We do so with a reminder to the parties

43

that, as we suggested during oral argument, this case seems ripe for resolution by informal collaboration, given the time and efforts already expended on obviously, and now even more, outdated information.

## CONCLUSION

For the reasons stated above, we **VACATE** the judgment and **REVERSE** the decision of the district court. We **REMAND** for proceedings consistent with this opinion.