# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-3048

_____

J.P., By Next Friend Alisha Ogden

*Plaintiff - Appellant*

v.

Belton School District No. 124

*Defendant - Appellee*

Missouri State Board of Education, and Department of Elementary and Secondary
Education; Office of Special Education

*Defendant*s

------------------------------

Council of Parent Attorneys and Advocates, Inc.; Disability Rights Arkansas, Inc.;
Disability Rights Education & Defense Fund; Disability Rights Iowa; Disability
Rights South Dakota; Minnesota Disability Law Center; National Disability Rights
Network

*Amici on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 14, 2022
Filed: July 26, 2022

_____

Before LOKEN, KELLY, and KOBES, Circuit Judges.

_____

KELLY, Circuit Judge.

The parties to this matter—Alisha Ogden, on behalf of her son J.P., and the Belton School District—disagree about the appropriate school placement for J.P. pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* Ogden appeals the decision of the district court[1] granting judgment on the administrative record to the District.[2] We affirm.

## I.

The IDEA protects the right of children with disabilities to receive a free appropriate public education (FAPE). By statute, an individual education plan (IEP) must be developed for the child with disabilities that sets measurable annual goals for the child's academic and functional progress and identifies the aids and services needed to attain those goals. See 20 U.S.C. § 1414(d)(1)(A). "To meet its substantive obligation under the IDEA [to provide a FAPE], a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017). Where a child is not able to achieve at grade level, "his educational program must be appropriately ambitious in light of his circumstances." Id. at 1000. A student making "'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all." Id. at 1001.

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

[2]The operative complaint also contained a separate claim for retaliation. The district court granted the District's motion for summary judgment on that count, and Ogden does not appeal that aspect of the district court's decision.

The IDEA also protects the child's right to receive a FAPE in the least restrictive environment (LRE). The IDEA requires that,

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). In other words, the IDEA codifies a "preference for mainstream education." Pachl v. Seagren, 453 F.3d 1064, 1067 (8th Cir. 2006). But it also "significantly qualifies the mainstreaming requirement by stating that it should be implemented 'to the maximum extent *appropriate*' and that it is inapplicable where education in a mainstream environment 'cannot be achieved *satisfactorily*.'" Id. at 1067–68 (emphasis in original) (cleaned up and citation omitted). The LRE therefore cannot be determined without considering whether the child is receiving a FAPE: The availability of a FAPE—that is, the child's ability to make meaningful progress in the environment—is part of what constitutes the LRE. The IDEA implementing regulations therefore provide for a "continuum of alternative placements"—"instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions" to ensure a school district can "meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.115. The IDEA does not allow a school to place a child in a less restrictive environment in which he or she makes little or no progress towards appropriate educational goals.

The IEP, which sets the child's placement and functional and academic goals, is developed by the IEP team. This team includes the child's parents, the special education teacher and any other special service providers, and a district representative. See 20 U.S.C. § 1414(d)(1)(B). When a school intends to change a child's IEP, it must provide written notice to the parent. See id. § 1415(b)(3). If the

parent opposes the proposed change, he or she may file a complaint and initiate an impartial due process hearing by the state.[3]  See id. § 1415(f).  In Missouri, the Administrative Hearing Commission (AHC) conducts these due process hearings to resolve disputes regarding IEPs.  "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005).

Either party may seek review of the AHC's decision by the federal district court.  See 20 U.S.C. § 1415(i)(2)(A).  The district court independently evaluates the administrative record and grants the relief supported by the preponderance of the evidence.  See id. § 1415(i)(2)(C).  "The court must nonetheless give 'due weight' to the administrative proceedings and should not 'substitute its own notions of sound educational policy for those of the school authorities' which it is reviewing."  Pachl, 453 F.3d at 1068 (cleaned up) (quoting Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1028 (8th Cir. 2003)).  "We review the district court's findings of fact for clear error and its conclusions of law de novo."  Id.

## II.

It is against this background that we consider J.P.'s complaint.  J.P. is a child with a disability as defined by the IDEA.  See 20 U.S.C. § 1401(3).  He enrolled at

---

[3]On appeal, Ogden objects to the district court's use of the term "IEP team" to refer only to the District representatives and not to include Ogden or her invitees, Princess Banks from Missouri Parents ACT and Sandy Calvert from the Office of the Guardian Ad Litem.  We recognize that the statute defines "IEP team" to include the child's parent and, "at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate."  20 U.S.C. § 1414(d)(1)(B)(vi).  But while it is technically inaccurate to use this term to refer only to the District employees on the IEP team, this error has no impact on the outcome of the case.  When there is a dispute within the team, the ultimate statutory obligations of the IDEA rest on the school district, and the parent can initiate a due process proceeding to challenge the school's conclusion.  See id. § 1415(a).

Kentucky Trail Elementary School in the Belton School District in February 2018. Ogden, J.P.'s mother, met with staff at Kentucky Trail on March 22, 2018, to update J.P.'s IEP. The IEP set six goals covering J.P.'s functional, language, and gross motor skills: (1) increased functional skills like pushing buttons, turning pages, filling/dumping containers; (2) use of a feeding utensil; (3) use of eye gaze or touch to choose between two activities; (4) use of switches to make choices; (5) increased stamina sitting upright and standing; and (6) increased mobility with a reverse rolling walker. The IEP provides for J.P. to receive all instruction in the special education classroom—1,835 minutes of functional skills instruction per week, plus 90 minutes each of occupational, physical, and language therapy. He eats lunch in the special education classroom and is exposed to peers without disabilities only in the hallways and at recess.

In May 2018, the District told Ogden it wanted to assess J.P.'s eligibility for placement at Trails West, a Missouri School for the Severely Disabled. The District arranged for Ogden to take a tour of Trails West and began the application process to see if J.P. would be eligible. The District convened another IEP meeting in October 2018 and provided Ogden with written notice that the updated IEP would change J.P.'s placement from fulltime in the special education classroom to a public special school and that J.P. had been found eligible to attend Trails West.

Ogden did not agree with the District's changes to J.P.'s IEP and filed a complaint with the AHC. The District agreed to continue with the March 2018 IEP and reevaluate J.P. before proceeding with any changes, and Ogden withdrew her complaint. In January 2019, J.P. was evaluated by an independent psychologist. The psychologist's report recommended that an "ideal educational environment" for J.P. would include a "specialized setting with staff who are expert in working with children who are diagnosed with significant intellectual disabilities," a classroom "specially designed for children with developmental delays," and a "small student to teacher ratio" including support staff who are "highly trained and specialized in working with complex children with physical and intellectual disabilities." The

District also prepared a comprehensive evaluation report of the data it collected regarding J.P.

The IEP team met again on March 1 and April 26, 2019. In April, Ogden asked that the District add a behavior intervention plan to J.P.'s IEP to address vomiting and inappropriate behaviors like headbanging or biting others. The District agreed to conduct a Functional Behavior Assessment (FBA). Based on the results of the FBA, the District concluded that J.P.'s behaviors "do not impede his learning or the learning of others in the school setting and no behavior intervention plan is necessary."

The IEP team met to discuss J.P.'s placement again on August 23, 2019. The District again suggested that J.P. would be best served at Trails West. Ogden wished for J.P. to remain at Kentucky Trail, which she contended would be the LRE, and suggested that if Kentucky Trail could not meet his needs, she preferred for him to be placed in a private school rather than at Trails West. District participants objected that the private schools in the area were not equipped to implement J.P.'s IEP goals, whereas Trails West would already have everything in place for him. The new IEP listed public separate school as J.P.'s placement.

Ogden filed a complaint with the AHC, which was heard in January 2020. The AHC found the IEP to which Ogden objected "is reasonably calculated to enable [J.P.] to make progress appropriate in light of his circumstances and his LRE is Trails West." Ogden appealed this decision to the federal district court, which affirmed the AHC's conclusion. Ogden timely appealed to this court.

III.

On appeal, Ogden asserts that transferring J.P. to Trails West would violate his right under the IDEA to be educated in the LRE. Ogden indicates that she was satisfied with J.P.'s progress towards the goals in his IEP and that J.P. should remain at Kentucky Trail in the special education classroom. Alternatively, Ogden argues,

if J.P. needs additional services, the District should provide them in J.P.'s current placement. The District, on the other hand, stresses that J.P. is not making adequate progress towards his IEP goals at Kentucky Trail, and it is therefore necessary to transfer him to Trails West to ensure he is receiving a FAPE.

Thus, the question before the court is whether Kentucky Trail or Trails West is the LRE in which J.P. can receive a FAPE. Ogden acknowledges the applicable test: It is appropriate under the IDEA to place a student in a less integrated setting "when 'the handicapped child would not benefit from mainstreaming,' when 'any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting,' and when 'the handicapped child is a disruptive force in the non-segregated setting.'" Pachl, 453 F.3d at 1068 (quoting Roncker v. Walter, 700 F.2d 1058, 1063 (6th Cir. 1983)); see also N.W. ex rel. A.W. v. NW R-1 Sch. Dist., 813 F.2d 158, 163 (8th Cir. 1987) (applying the standard from Roncker to determine whether a student's rights were violated by placement in a separate school for students with disabilities).[4]

Ogden argues that the district court erred in determining that consideration of these factors permits J.P.'s placement at Trails West because the "District has not shown" that any of these requirements are satisfied. But this misstates the burden of proof in this case—since Ogden challenges the IEP, it was her burden before the AHC to show that the IEP does not meet the District's obligations under the IDEA. See Schaffer, 546 U.S. at 62. We conclude that she did not meet this burden.

After careful review of the factual record, we find no clear error in the district court's factual findings and agree that a preponderance of the evidence supports the

---

[4]We note that, like in Pachl, the District here does not rely on J.P.'s behavior as a basis for placing him in a less integrated setting, nor could it, since the FBA concluded his behavior was not disruptive to learning. But while this factor does not weigh in favor of a less integrated environment, it does not preclude such a placement.

AHC's conclusion that placement at Trails West respects J.P.'s rights under the IDEA. First, the district court did not clearly err in concluding that J.P. derives minimal benefit from the less restrictive environment at Kentucky Trail, as the evidence supports the district court's conclusion that J.P. was making little or no progress toward his IEP goals in his current placement. The District provided a periodic progress report on J.P.'s annual measurable goals. J.P. was assessed as to his progress on Goal 1 on five dates between May and November 2018. On three dates, the report indicated no progress, and slow progress on two dates, with J.P.'s attention span increasing from an average of 20 seconds to an average of 30 to 40 seconds. During the same period, J.P. exhibited "no progress" on four dates and "slow progress" on one date as to Goal 2. J.P.'s progress on Goals 3 and 4 was similarly inconsistent, demonstrating no sustained improvement during the period. The record contains testimony from the special education teacher at Kentucky Trail that J.P.'s progress in her classroom has been "very minimal and inconsistent." Additionally, the District's director of special education testified that the data show "small incremental growth on IEP goals" and that "in three years he has shown regression in the big picture." The director further testified that J.P. "had 16 months of instruction in a placement [where] they adore him, but he's not really making the significant progress" and that maintaining his placement at Kentucky Trail rather than transferring him to Trails West "would be settling for programming that would deny him a true free appropriate public education [he needs] in order to truly have meaningful benefit and to be able to participate in his life."

The parties agree that J.P. met Goals 5 and 6 regarding his mobility. The District argues, however, that this progress was due to J.P.'s natural growth and physical maturation and should not be considered evidence supporting J.P.'s continued placement at Kentucky Trail. Ogden argues that the district court gave insufficient weight to this evidence of J.P.'s progress and challenges the District's "novel legal argument" that it is appropriate to consider whether the placement was relevant to the child's progress and not just the fact that he was progressing. But the relevant inquiry for purposes of the IDEA is whether the school is providing a FAPE in the LRE. Therefore, if the school placement has little or no relevance to the

child's progress, that progress should not be relied on as evidence of the effectiveness of the placement. A preponderance of the evidence supports the inference that J.P.'s mobility improved as a natural result of his growth and physical maturation, regardless of his placement at Kentucky Trail. Under these circumstances, the improvement in J.P.'s mobility cannot be used to justify maintaining a placement in which a preponderance of the evidence supports the conclusion that J.P. is not making appropriate progress toward his other goals.

Second, although Ogden emphasizes the social benefit J.P. receives from his more integrated placement at Kentucky Trail, the evidence shows J.P. receives all of his instruction in the special education classroom and eats lunch there as well, and he has contact with nondisabled peers only when passing in the hallways or at recess. J.P.'s teacher acknowledged that J.P. "makes great eye contact" and he "is seeing [his peers] and he does smile at them when they initiate with [him]" in the special education classroom. At recess, however, J.P.'s teacher indicated that "[h]e's not acknowledging or looking for that contact [with nondisabled peers] really at recess, that I've noticed." And J.P. does not spend any other parts of the day in the general education setting. He does not eat lunch in the school cafeteria because he was "starting to vomit more and more after being in that highly stimulating environment." He also "responds [to mainstream settings] by doing things like dropping to the floor, putting his hands over his ears." He does not participate in music, art, or PE classes or attend general assemblies with nondisabled peers for this reason. On this basis, the district court did not clearly err in concluding that J.P. derived minimal social benefit from the more integrated environment at Kentucky Trail.

Further, there was sufficient evidence to support the conclusion that placement at Trails West offers substantial benefits for J.P. For example, J.P.'s teacher at Kentucky Trail has twelve students and three staff members in her classroom, and she noted that J.P.'s "concentration skills are so fragile, any sensory input can take him off task" such as "somebody walking around the room" or "somebody coming in the room." In contrast, the teacher at Trails West has five

-9-

students in her classroom and three adults. J.P.'s teacher agreed that the "limited stimuli at Trails West" would "allow [J.P.] to be more available to learn." Another District employee involved in the IEP process opined that the sensory input at a school with four or five hundred students was overwhelming to J.P., that it "takes a lot for a student to be able to kind of weed all of that out to be available for learning," and that J.P.'s "availability for learning in that smaller, less chaotic environment [of Trails West] would be beneficial." J.P.'s teacher at Trails West would also have a specific certification for teaching students with severe and profound disabilities, which the teacher at Kentucky Trail does not have. And Trails West has a home-school coordinator who provides support to students' families.

Based on these facts, we agree with the district court that a preponderance of the evidence supports the AHC's conclusion that the benefit of maintaining J.P.'s more integrated placement at Kentucky Trail is outweighed by the benefits available to him through placement at Trails West.[5] While Kentucky Trail is a less restrictive environment on the placement continuum, the IDEA does not allow the school to sacrifice a student's access to a FAPE to have him in a more integrated setting. The LRE is explicitly determined in light of where the child is able to make meaningful progress towards reasonable goals. The record supports the conclusion that J.P. is not making meaningful progress towards reasonable goals in his special classes at Kentucky Trail. Therefore, it is not his LRE, and the next step on the placement continuum is a special school like Trails West, which can offer an environment and specialized instruction more tailored to his needs.

Finally, Ogden argues that if J.P.'s progress at Kentucky Trail is inadequate, then the District must augment the services it provides in that placement. This argument is inconsistent with Ogden's assertion that she is "elated with the educational growth J.P. has made at Kentucky Trail." But to the extent that Ogden

---

[5]Ogden identifies inconsistencies in the factual record she believes the district court overlooked. Upon careful review, we conclude that Ogden overstates these aspects of the record and find no clear error in the district court's factual findings.

is, in the alternative, challenging the services provided at Kentucky Trail, Ogden continues to have the burden to show that the IEP is inadequate. She has not explained how a teacher with more specialized training operating in the environment at Kentucky Trail would improve J.P.'s progress nor identified additional services J.P. needs that are not being provided. We find no abuse of discretion in the district court's conclusion that J.P.'s placement at the public separate school Trails West respects J.P.'s rights under the IDEA.

For these reasons, the decision of the district court is affirmed.

_____