# United States Court of Appeals

### For the Eighth Circuit

_____

No. 21-1707

_____

Minnetonka Public Schools, Independent School District No. 276

*Plaintiff - Appellant*

v.

M.L.K., by and through his parents, S.K. and D.K.

*Defendant - Appellee*

------------------------------

Minnesota School Boards Association; Minnesota Association of School Administrators; The Minnesota Administrators for Special Education

*Amici on Behalf of Appellant(s)*

Council of Parent Attorneys and Advocates, Inc.; Minnesota Disability Law Center; The International Dyslexia Association - Upper Midwest Branch; Decoding Dyslexia - Minnesota; National Parents Union; Dyslexia Advocates

*Amici on Behalf of Appellee(s)*

_____

No. 21-1770

_____

Minnetonka Public Schools, Independent School District No. 276

*Plaintiff - Appellee*

v.

M.L.K., by and through his parents, S.K. and D.K.

*Defendant - Appellant*

------------------------------

Council of Parent Attorneys and Advocates, Inc.; Minnesota Disability Law
Center; The International Dyslexia Association - Upper Midwest Branch;
Decoding Dyslexia - Minnesota; National Parents Union; Dyslexia Advocates

*Amici on Behalf of Appellant(s)*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: December 15, 2021
Filed: July 29, 2022
_____

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.
_____

KOBES, Circuit Judge.

M.L.K. is a special education student in the Minnetonka School District. His parents brought a due process challenge under the Individuals with Disabilities Education Act (IDEA), claiming that the School District failed to provide him a free appropriate public education (FAPE). An administrative law judge agreed and ordered compensatory education. The district court affirmed, but reduced the compensatory education award based on the statute of limitations. The parties cross-appealed. Because we find that the School District fulfilled its obligations under the IDEA, we reverse.

# I.

M.L.K. started Ready Set Kindergarten[1] in 2014. At the end of the school year, he had not made the expected progress. The School District evaluated him for special education services and found him eligible under the criteria for Autism Spectrum Disorder. The evaluation said that he had trouble with math, reading, writing, and attention, as well as social and behavioral issues. M.L.K. received one-on-one support in reading and phonics, among other subjects. At the end of the year, M.L.K.'s individualized education program (IEP) team met and set annual goals, including ones aimed at improving his reading skills. Specifically, M.L.K.'s IEP reading goals for the following year were (1) verbally identify letters; (2) correlate the letter to the sound it makes; and (3) read sight words.[2] The IEP stated that M.L.K. would receive small group academic instruction every day for 30 minutes.

For the 2015–2016 school year, while M.L.K. was in his second year of kindergarten, he received 30 minutes of small group instruction in reading, writing, and math every day. About halfway through the year, his IEP team met and reviewed his progress. The team found that M.L.K. met one goal already, and continued to improve on the other two. The report also noted that M.L.K. continued to struggle with attention issues, which were impacting his learning and retention. At the end of the school year, his IEP team met again to review his records and set new goals for the next year. The team noted that M.L.K. continued to make progress on his remaining two goals, but hadn't met them yet. Nonetheless, it updated all three goals

---

[1]Ready Set Kindergarten is a program for kindergarten-age students who are not ready for a traditional kindergarten program. At the end of the year, students can take another year of kindergarten or move on to first grade.

[2]The goals included specific measurable benchmarks, which were: (1) verbally identify 21/26 uppercase and lowercase letters; (2) give the sound of 21/26 letters; and (3) read 4/25 words on a high frequency sight word list.

with more ambitious benchmarks,[3] and increased the frequency of small group academic instruction.

M.L.K. entered first grade in 2016 and received one-on-one instruction twice a day in reading, writing, and math. Again, his progress was evaluated halfway through the year. This time, his team noted that despite continued attention-related struggles, M.L.K. was making headway on all three goals. At the IEP meeting at the end of first grade, his team pointed out that M.L.K. made steady improvements overall, but continued to struggle with decoding and phonological processing in reading, and was still reading at a kindergarten level. The IEP team came up with more advanced goals and more in-depth benchmarks.[4]

In 2017, M.L.K. started second grade. That year, he received one-on-one instruction in reading and writing as well as 40 minutes of small group instruction daily. But he continued to lag behind his peers with reading, and needed almost constant reminders to bring his attention back to his work. His progress reports showed that his teachers thought he was improving, but noted a continuing need to increase reading services. In the spring, his special education needs were reevaluated. The evaluation showed that he continued to need support in reading, phonics skills, math, writing, language skills, and autism-related behaviors, but also stated that he qualified for speech and language services. At the end of second grade, the IEP team said that, despite making some progress,[5] M.L.K. was still not meeting the expectations for his grade level. Because of this, the goals for the next year were

---

[3]The new IEP goals were: (1) give the sound of 26/26 letters; (2) read 15/25 high frequency sight words; and (3) read 8/10 words on a list of consonant-vowel-consonant words.

[4]This time, the IEP set out two goals. One listed objectives for M.L.K. to meet on a phonological processing assessment, and the other listed objectives for him to meet on an independent reading assessment. It also noted that his current level of phonemic awareness was level B, and the goal was to get him to perform at level F, which is considered a mid-first grade level.

[5]M.L.K. moved from a level B phonemic awareness to a level C.

largely identical to the 2017 goals, but the IEP proposed increasing M.L.K.'s one-on-one instruction in reading to 75 minutes total each day.

Before third grade, M.L.K.'s parents asked that he be instructed using the Wilson Reading System (WRS) curriculum. The School District advised that M.L.K. was not ready for this type of curriculum because he couldn't pay attention during the longer instruction periods that the WRS calls for. The School District said that he would likely be a good candidate in fourth grade.

During the 2018–2019 school year, M.L.K. was in third grade. At this point, he was receiving over an hour of special education services in reading each day in addition to the general reading curriculum. His progress reports observed that M.L.K had come a long way and, at the beginning of his special education, he "struggled with his attention and focus so much that it was difficult to determine if he was learning and absorbing our lessons and discussions." But he continued to improve on the IEP goals—by this point, he had mastered all letters and digraph sounds, was able to decode one-syllable words with high accuracy, could read and recognize words in a "word family," and was reading at a mid-first grade level. Shortly after the progress report, the team met again to amend M.L.K.'s IEP. The new plan placed M.L.K. in a group for WRS instruction for 60 minutes, four times a week, with additional support for reading and writing. It also increased his goals and benchmarks. At the end of third grade, the IEP team met one more time to make a new IEP for fourth grade. The plan stated that M.L.K. "displayed great progress toward his reading goals," and once again raised his reading goals to a more difficult level.

In August 2019, just before M.L.K. started fourth grade, his parents brought a due process challenge under the IDEA. They claimed that the School District denied M.L.K. a FAPE by failing to address his reading needs. They also requested an Independent Education Evaluation, which formally diagnosed him with ADHD

and severe dyslexia, in addition to autism.[6]  The due process hearing was held in December 2019.  The administrative law judge (ALJ) determined that the school failed to provide M.L.K. with a FAPE because it failed to (1) assess him in all areas of suspected disability; (2) develop appropriate IEP goals; (3) revise the IEP to address M.L.K.'s lack of expected progress; and (4) offer extended school year services.  The ALJ ordered the school to provide retroactive compensatory education, but limited it to claims after 2015.

The School District sought judicial review of the ALJ's decision in federal court, and both the School District and M.L.K. moved for judgment on the administrative record.  The district court affirmed the ALJ's ruling that the School District failed to provide a FAPE, but limited the compensatory education award to relief for violations after August 2017.  It explained that the School District failed to properly identify M.L.K.'s most debilitating disabilities—dyslexia and ADHD—which led to its failure to design an IEP that properly met his reading needs, and its failure to reassess his goals when he did not meet them.  The parties cross-appeal.

## II.

Under the IDEA, children with disabilities are entitled to a free appropriate public education.  20 U.S.C. § 1412(a)(1)(A).  Schools are responsible for identifying and evaluating students' need for special education services and creating an annual IEP.  *Id.* at § 1414(a)–(d).

The IEP is developed by a student's IEP team, which typically includes teachers, school officials, and the child's parents.  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017).  The team must assess the child's academic performance, describe how their disability affects their learning, create measurable goals, and track their progress.  20 U.S.C.

---

[6]After the school district received M.L.K.'s IEE diagnoses, it continued to list his primary disability as autism on his IEPs, and identified a secondary disability as a speech/language disorder.

§ 1414(d)(1)(A)(i)(I)–(III).  The plans must be "tailored to the unique needs of a particular child" and "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.

"Because judges are not trained educators, judicial review under the IDEA is limited." *E.S. v. Indep. Sch. Dist., No. 196 Rosemount-Apple Valley*, 135 F.3d 566, 569 (8th Cir. 1998).  "When reviewing a school district's compliance with the IDEA's requirements after an administrative hearing, the district court should make an independent decision, based on a preponderance of the evidence, whether the IDEA was violated" but "must nonetheless give due weight to the administrative proceedings and should not substitute its own notions of sound educational policy for those of the school authorities." *Pachl v. Seagren*, 453 F.3d 1064, 1068 (8th Cir. 2006) (quotation omitted) (cleaned up).  On appeal, we review the district court's factual findings for clear error, and the determination of whether the school provided a FAPE *de novo*.  *I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Schs.*, 863 F.3d 966, 970 (8th Cir. 2017).  But our review is focused on "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999.

As an initial matter, the School District claims that the district court erred in applying the burden of persuasion.  It argues that M.L.K.—the party that initiated the challenge—must prove that the School District failed to fulfill its obligations under the IDEA.  But since the IDEA is silent on this issue, we apply the default rule that a party seeking to challenge the outcome below bears the burden of persuasion. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005) ("Absent some reason to believe that Congress intended otherwise, therefore, we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.").

The district court found that the School District failed to provide M.L.K. with a FAPE because it didn't identify his most debilitating disabilities—dyslexia and ADHD.  This in turn prevented it from designing an IEP that was reasonably calculated to enable M.L.K. to receive educational benefits.  The School District argues this was an error, claiming that the court placed too much emphasis on the

specific classification of M.L.K.'s disabilities, and that his IEPs were reasonably calculated to enable him to make appropriate progress in light of his circumstances. We agree.

While we are sympathetic to M.L.K.'s struggles, we find that his slow advancement in reading was not caused by the School District's misclassification of his primary disabilities. First, the IDEA does not require schools to classify students by their particular diagnosis, and in many cases, the specific diagnosis will "be substantively immaterial because the IEP will be tailored to the child's specific needs." *Fort Osage R-1 Sch. Dist. v. Sims ex rel. B.S.*, 641 F.3d 996, 1004 (8th Cir. 2011). In fact, the Minnesota Department of Education states that dyslexia is a medical diagnosis and warns that "[e]ducators are not qualified to diagnose dyslexia."[7] The School District identified M.L.K.'s difficulty with reading and focus in his first year of kindergarten. Specifically, it reported that M.L.K. needed support in reading and phonics, and couldn't remain engaged in lessons, at times needing reminders every couple of seconds to stay on task. And even after M.L.K. was diagnosed with dyslexia and ADHD, the School District did not change his disability classification, signaling that the formal diagnosis did not change the IEP. The fact that it did not put a formal diagnosis in his IEP is not a violation of the IDEA. The School District fulfilled its evaluation obligations under the statute by identifying and evaluating M.L.K. in "all areas of suspected disability" including his specific struggles with reading and attention. 20 U.S.C. § 1414(b)(3)(B).

Even if M.L.K.'s disability was misclassified, he was not denied a FAPE because the School District created an IEP that was "reasonably calculated" to allow him to make appropriate progress "in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999. The district court concluded that the School District failed to make

---

[7]Minn. Dep't of Educ., *Dyslexia Discussions: Information for Schools and Families*, https://education.mn.gov/mdeprod/idcplg?IdcService=GET_FILE&dDocName=prod035227&RevisionSelectionMethod=latestReleased&Rendition=primary (last visited June 22, 2022).

"meaningful adjustments" to M.L.K.'s IEP. But the record demonstrates otherwise. The School District continuously updated his goals and benchmarks, tried out new curricula, and increased his small group and one-on-one instruction. While we acknowledge that the IEP goals were largely the same for second and third grade, the overall trend shows that the School District set achievable, measurable goals that, when combined with consistently increasing special education services, were reasonably calculated to allow M.L.K. to make appropriate progress.

M.L.K. further argues that because the School District failed to classify him as dyslexic, it did not provide a dyslexia-specific method of reading instruction. He points out that the school refused to teach him using the WRS, a dyslexia-specific reading method. While the School District dutifully considered that request, it ultimately declined it because it felt that M.L.K. was not a good candidate. The School District explained that he lacked the attentional stamina to make it through the longer lessons that WRS prescribes. But in a later meeting during third grade, it amended M.L.K.'s IEP and placed him in a WRS group with a Wilson Certified Paraprofessional.[8]

Ultimately, the parties dispute what "reasonably calculated" means in this case. The IDEA "does not require a school district to maximize a student's potential or provide the best possible education at public expense," nor does it require specific results. *C.B. ex rel. B.B. v. Special Sch. Dist. No. 1, Minneapolis*, 636 F.3d 981, 989 (8th Cir. 2011) (quotation omitted). This is not a case where the student made no progress, or regressed over the years. *See id.* at 984–85. Nor is it the case where any improvement was undercut by unaddressed struggles in other areas. *See D. L. by Landon v. St. Louis City Sch. Dist.*, 950 F.3d 1057, 1064–65 (8th Cir. 2020). Although M.L.K. cannot read at his grade level, the IDEA looks for improvement, not mastery. His IEPs demonstrate that he made progress in reading, as well as his other academic goals. The School District fulfilled its obligations under the IDEA,

---

[8]Notably, it was the only school district in the state that provided WRS instruction at the time.

so we vacate the district court's order and remand to enter a judgment in accordance with this opinion.[9]

––––––––––––––––––––––––––––––

---

[9]Because we find that the School District did not violate the IDEA, we don't reach the statute of limitations question.